## SUPREME COURT.

### LEWIS H. MEYER agt. JAMES I. ROOSEVELT.

In construing the *constitution of the United States*, it is a settled principle that no powers are to be *assumed as possessed* by the government, except those which were *granted by the states*; and that all other powers are reserved to the states. Congress is authorized to pass all laws " which shall be necessary to carry the powers *granted thereby* into execution;" but beyond this authority its laws have no force.

It is conceded that congress has power to *issue paper money*; but it has no power to pass a law declaring such paper money to be a *legal tender in payment of private debts created before the passage of such law*.

There is no connection between the right and power to *coin money and regulate its value*, and the power to *compel persons to take paper money in discharge of a contract*; and there is no ground upon which the act of congress of February 25th, 1862, can be sustained in connection with this power.

*It seems*, the framers of the constitution never intended that congress should have authority to provide that a *tender* might be made in any other money than the constitution of the United States permitted the states to designate by law for that purpose. On the contrary, the presumption from this restriction on the legislation of the states is, that it was intended to make *coin, and nothing else*, the medium to be used for a *legal tender in payment of debts*. (*The decision in this case, it will be seen, is directly adverse to that of Hague agt. Powers, ante, p.* 17.)

*New York General Term. Argued November term*, 1862, *before Justices* INGRAHAM, LEONARD *and* PECKHAM; *decided June term*, 1863.

IN 1854, Samuel Bowne delivered his bond to defendant, conditioned to pay $8,000, with interest, in August, 1857. The bond was given to secure a loan of $8,000 to Bowne, for which the defendant gave his check upon the Chemical Bank, payable in gold, at the option of Bowne. As a further security, Bowne and his wife executed a mortgage on certain land in Richmond county. The mortgaged premises were subsequently conveyed to plaintiff, subject to said mortgage, the payment of which plaintiff assumed, the amount received having been deducted from the purchase money. In June, 1862, plaintiff, desiring to pay the mortgage, tendered to defendant $8,170 in United States notes, issued under act of February 25, 1862. Defendant refused the same as legal tender, claiming that the payment should

be made in gold coin of the United States, as being the money in which the loan was made. It was agreed, however, that defendant should receive the notes conditionally, and that the question as to their being legal tender in payment of said mortgage should be submitted to a court having jurisdiction, and if said court should decide affirmatively, then the mortgage to be delivered and discharged of record ; if, on the contrary, the decision should be that they were not legal tender, that then the plaintiff pay defendant $326.78 additional, with interest, that being the amount of difference at four per cent. between the market value of said notes and gold coin in June 11, 1862. A case was agreed upon, and submitted to the court without action.

B. ROELKER, *counsel for plaintiff.*

JAMES I. ROOSEVELT and GEO. T. CURTIS, *for def't.*

By the court, INGRAHAM, P. Justice. The defendant was the holder of a bond and mortgage executed in 1854, to secure the payment of money loaned at that time. The bond and mortgage were made payable prior to 1862, " in lawful money of the United States."

The plaintiff being the owner of the equity of redemption in the premises mortgaged, on the 11th June, 1862, tendered to the defendant the amount due for principal and interest, in treasury notes of the United States issued under the act of 25th February, 1862, and demanded a satisfaction of the mortgage. This the defendant refused to accept, claiming that he was entitled to be paid in specie. An arrangement was made between the parties to accept them on account, subject to the liability of the plaintiff to pay a further sum as agreed upon between them, if the court should be of the opinion that the said notes were not a legal tender.

It is difficult to conceive of a question that can be submitted to the adjudication of the courts in a matter affect-

ing property, that involves more momentous and important consequences than are connected with the proper decision as to the powers of congress in making the treasury notes of the government a legal tender. The interests of the country and of individuals, to an almost unlimited extent, are affected by it, and its importance is not lessened by the consideration that it involves the construction of the powers granted by the constitution of the United States.

Although this case was fully and ably argued before us by the learned counsel engaged therein, I do not deem it necessary, for the disposition thereof, to pass upon all of the questions so argued, and unless absolutely necessary for the decision of the case before us, a particular examination of them at this time will not be required.

At the time when the contract which forms the subject-matter of this action was made, and at the time when it became due, there was no lawful money of the United States, except gold and silver coin, that could be used as a legal tender, and it cannot be pretended that any other could then be used for that purpose. Under such circumstances the contract had been made, had matured, and the rights of the creditor under it had become perfect. It was after this that congress passed the act of Feb. 25, 1862, by which it was provided that the treasury notes authorized thereby " shall be lawful money, and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest on the public debt."

The principle has been long since settled, that in construing the constitution of the United States, no powers are to be assumed as possessed by the government, except those which were granted by the states, and that all other powers are reserved to the states.

These powers are either granted directly in the constitution, or are implied under that clause which authorizes the passage of " all laws which shall be necessary and pro-

per for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States," &c.

I think it cannot be doubted that this clause does not confer any powers which are not necessary for the carrying into effect the powers expressly conferred by the constitution. The intent of the clause was not to confer any new powers, but to authorize the *passage of laws* " which shall be necessary to carry the powers granted thereby into execution."

Congress was authorized by this provision to pass all laws that should be necessary for this purpose, but beyond that authority it had no force.

These laws, therefore, must be in relation to such powers, and if they are not for the purpose of carrying such powers into execution, they are unauthorized. Unless they are necessary and proper for, or conduce to that purpose, they do not come within the limits of that section—unless the laws so passed aid in carrying out some expressly granted power, they cannot be sustained. It was said by Mr. Madison in regard to this clause, " that if it had been omitted, the government would have possessed all the particular powers requisite as a means of executing the general powers conferred by unavoidable implication," showing that he understood the clause as conferring no greater powers than the government would have possessed without it, and, therefore, that its operation was to be limited to such laws as were necessary to carry the granted powers into execution.

In *Martin* agt. *Hunter*, (1 *Wheat.*, 304,) it was said " that the government of the United States could claim no powers which are not granted by the constitution, and the powers actually granted must be such as are expressly given or given by necessary implication." The words are to be taken in their natural and obvious sense, and not in a sense unreasonably restricted or enlarged. And in *Mc-*

*Cullough* agt. *The State of Maryland*, (4 *Wheat.*, 316,) if the end be legitimate, and within the scope of the constitution, all the means which are appropriate and plainly adapted to that end, and not prohibited, may be constitutionally adopted.

The means thus to be used must be such as are connected with and have a relation to the end to be attained, or, in the language of Chief Justice MARSHALL, "which are in fact conducive to the exercise of a power expressly granted by the constitution."

I shall take it for granted, in the further examination of this case, that congress has power to issue paper money. The discussions in the convention, and the subsequent discussions and decisions upon the power of congress to charter a bank, seem to concede this power. (*See Craig* agt. *State of Missouri*, 4 *Peters*, 410 ; *Briscoe* agt. *Bank of Kentucky*, 11 *Peters*, 257 ; *Thorndike* agt. *United States*, 2 *Mason, p.* 1.)

If congress has the power to issue such paper as money, it follows that the same would be lawful money of the United States. It is made payable for all debts due the United States, and by the act it is declared to be lawful money of the United States. The exception as to receiving it for duties may rest on an entirely different basis. The amount of duties to be paid on the importation of goods is not a debt, but is a payment for the privilege of introducing goods into the United States. Congress having the power to fix the amount of duties, has also the right to say in what such duties shall be payable, and the provision that duties shall be paid in gold, is not a provision for paying a debt in gold, but one fixing the mode in which duties are to be collected.

The question then arises whether congress has the power to declare such paper money to be a legal tender ?

The tenth section of the first article of the constitution left to the states the power to regulate the law of tender,

subject to the restriction that they should make such tender to consist only of gold and silver coin.

Under those provisions the state could say what coins should or should not be used for such purpose. The states were bound by the restriction in the federal constitution to use gold and silver coin as the medium of payment, and they were to take the coins so used at the value fixed by congress; but further than that the constitution gave to congress no express power to interfere.

Notwithstanding this, it appears from the acts of congress, beginning with the act of 1793, and afterwards on various occasions, that congress has by statute declared what foreign coins should or should not be used for such a purpose. It is also to be observed that in this state no act has at any time been passed by the legislature of the state since the adoption of the constitution of the United States, declaring what should constitute a legal tender.

Still, I suppose the power to legislate on this subject within the restriction in the constitution of the United States, remains with the states. If the legislature should pass a law on the subject, they have the power to allow other foreign coins than those specially defined by congress to be used for such a purpose at the value fixed by congress therefor, but they could not declare these notes of the government of the United States to be a legal tender for debts. Any such provision would be a violation of the constitutional provision above referred to. It is difficult to adopt the conclusion that the framers of the constitution intended that congress should have authority to provide that a tender might be made in any other money than the constitution of the United States permitted the states to designate by law for that purpose. On the contrary, the presumption from this restriction on the legislation of the states is, that it was intended to make coin and nothing else the medium to be used for a legal tender in payment of debts. Any other would lead to the strange anomaly, that while the

states provide by law that nothing but gold and silver should be a legal tender for debts, congress could pass a law providing a substitute for coin, which if the state directed should be so received, their legislation would be void, as directly violating the constitution of the United States.

Nor do I see that there is any necessary connection between compelling individuals to receive the notes of the United States in payment of debts due them, with the isssue of them by the government for the payment of the debts of the government. Congress has the power to adopt such measures as may be necessary to pay the debts incurred in any manner for the government, but it by no means follows that to give such notes a higher value, they may compel individuals to recei.e them in exchange for property or debts due them without their consent.

The same argument would allow congress to take from the banks or from individuals the coin necessary to pay the interest on the public debt, and to repay therefor the notes issued by the government. It is just as necessary to maintain the credit of the government, that the interest should be paid in coin, as it is to give credit to the notes issued by the government by compelling individuals to receive them in payment of debts.

This question seems to have been a subject of discussion in the convention that formed the constitution. As originally reported, the clause giving the power to coin money contained the words, "and emit bills on the credit of the United States."

A motion was made to strike out these words, and it was opposed by others, as possibly necessary in some emergencies.

Mr. Madison suggested that it would be sufficient to prohibit making them a legal tender. The striking out was urged both to prevent their being made a legal tender, and

to remove the possibility of an issue of paper money by the government.

The words were stricken out by a vote of nine states to two. If the arguments of the members of the convention were entitled to weight in the decision of this question, it would seem to establish that the intent was not to confer such a power on the government. (*Madison's Papers*, 3*d* *vol.*, *p.* 1344.)

This idea was also fully stated by Mr. Webster, when he said, " most unquestionably there is, and there can be no legal tender in this country, under the authority of this government or any other, but gold and silver. This is a constitutional principle, perfectly plain and of the very highest importance. The states are expressly prohibited from making anything but gold and silver a tender in payment of debts; and although no such express prohibition is applied to congress, yet as congress has no power granted to it but to coin money and to regulate the value of foreign coins, it clearly has no power to substitute paper or anything else for coin as a tender in payment of debts and to discharge contracts."   *   *   *

The constitutional tender is the thing to be preserved, and it ought to be preserved sacredly under all circumstances. (4*th vol. Webster's Works*, *p.* 271.) And again he says : I am of the opinion, then, that gold and silver, at rates fixed by congress, constitute the legal standard of value in this country, and that neither congress nor any state has authority to establish any other standard, or to displace this. (4*th vol. Webster's Works*, *p.* 280.)

It was argued on the part of the plaintiff, that the section which confers authority on the government of the United States to coin money, regulate the value thereof, and of foreign coins, was sufficiently comprehensive to include the power to make paper money a legal tender. I am not able to adopt that conclusion. The coining of money has never been construed as including the issue of a paper

currency. Coin and coinage are understood to be the stamping of metal in some way so as to give them currency, but is not applied to any other material; and to regulate its value merely applies to the fixing the value of that which has been so coined, whether it be domestic or foreign coin. I can see no connection between the right and power to coin money and regulate its value, and the power to compel persons to take paper money on discharge of a contract; and there is no ground upon which the act of congress can be sustained in connection with this power.

It has been suggested that this power might be exercised under the powers necessary to be resorted to in time of war, for the support of the army and navy and the protection of the country against invasion. But there is nothing under this head giving any more authority than for the support of the government under any other department.

If the government in time of war needed individual property, and took possession of it by force, the owner would be entitled to full compensation therefor from the government. But for such a purpose the government could no more transfer the property of one man to another for less than its value, than they could do so to provide means for carrying the mails or paying the ordinary expenses of government.

There may be another view, however, of this question, which, as applied to contracts made after the passage of the law, might make these bills a proper medium of payment. The act declares them to be lawful money of the United States, and as such they might be used in the payment of debts which were payable in such lawful money, and probably in all debts contracted after the passage of the act, in the absence of any statutory provision of the state prescribing what should be a legal tender for debts. I do not deem it necessary, however, to decide upon this question in the present action, as there are other reasons

which relieve me from the further examination of this branch of the case.

Conceding that congress has power to pass a law making paper money a legal tender, is this statute retrospective in its operation ?

It is a settled principle in the construction of statutes, not to give them such an interpretation as will make them retrospective, unless the act declares that it shall have such an effect, or it is so worded it can have no meaning unless it is so applied.

The provisions of this statute would be satisfied by holding it to be simply prospective in its operation. Upon contracts made after its passage, less injustice would be done by enforcing its provisions. They were known when such contracts were made, and we may conclude that they were made in reference to the statute. But to apply them to contracts made previous to its passage, might work gross injustice, and should require in the statute a clear expression of the intent of the legislature before such a construction is adopted. A reference to the present condition of the currency will show at once such injustice. Contracts which were made when gold and silver were the only legal means of paying debts, would, under an application of those provisions, be payable in a currency much less valuable in the market, and in many instances, especially of contracts made abroad, would result in serious loss, if not ruin.

In this state there have been repeated decisions that acts of a legislature should be construed as only operating prospectively, unless they clearly show that a contrary interpretation should be given them.

In *Dash* agt. *Vankleeck*, (7 *John. R.*, 417, 503,) Ch. J. KENT says : " It is a principle in the English common law, as ancient as the law itself, that a statute even of its omnipotent parliament is not to have a retrospective effect. This was the doctrine as laid down by BRACTON and COKE,

and in *Gilmore* agt. *Shuter*, (2 *Mod.*, 310,) it received a solemn recognition in the court of King's Bench.

Various cases are cited by the chief justice in that case, and among others the case of *Calder* agt. *Bull*, (3 *Dallas*, 386,) in which the judges of the supreme court of the United States speak in strong disapprobation of all laws operating retrospectively, and that of *Ogden* agt. *Blackledge*, (2 *Cranch*, 272,) where they considered it plain that a statute could not retrospect so as to take away a vested right.

In *Quackenbush* agt. *Danks*, (1 *Denio*, 128, 130,) BRONSON, Ch. J., says, when laws are made to act upon past transactions, they cannot fail to work injustice.

And again, it is a well-established rule that a statute shall not be construed so as to give it a retrospect beyond the time of its commencement, and there are many cases in the books where general words, as comprehensive as those under consideration, have been restricted in their influence so as not to reach past transactions.

In *Kunfer* agt. *Kohns*, (5 *Hill*, 317,) the same rule is recognized as follows : " I admit the value of the rule that general words in a statute which may be satisfied by being allowed to operate on contracts made subsequent to its passage, should, in their application, be limited to the latter."

And in a later case, that of *Palmer* agt. *Cosely*, (4 *Denio*, 374,) it is said to be a doctrine founded upon general principles of law, that no statute shall be construed to have a retrospective operation without express words to that effect, either by an enumeration of the cases in which the act is to have such retrospective operation, or by words which can have no meaning unless such a construction is adopted. This latter case was affirmed in court of appeals, (2 *Comst.*, *p.* 182.) These cases from our own courts fully establish the position that a statute must not be construed so as to be retrospective in its operation, if it will bear any

other interpretation.    (*See also Whitman* agt. *Hapgood,* 10 *Mass.,* 437 ; *Medford* agt. *Learned,* 16 *Mass.,* 215.)

There is nothing in this act of congress making it retrospective.   The provisions of the law will be fully carried out by confining its operation to contracts made after the passage of the law, if it should be held that such a power is possessed by congress to make paper money, under any circumstances, a legal tender for the payment of debts, or if these bills, being made lawful money of the United States, become thereby the medium of payment of indebtedness created after the passage of the statute.

As the contract in this case was made, and the payment under it matured before the passage of the act of February 25, 1862, the same is not affected by the provisions of that statute.   The tender, therefore, was not sufficient, and the defendant is entitled to judgment.

LEONARD, Justice.   The primary question here is, whether congress may substitute treasury notes, or the promises of the government, in the place of gold and silver coin as money and a legal tender for the payment of debts between private persons ?

Another equally important question is also involved.   It is, whether congress may make such substituted medium for the payment of debts retroactive, so that the obligation of a contract may be impaired by the compulsory liability of a creditor to accept from his debtor a new and reduced standard of currency in discharge of his debt ?

Either of these questions being decided in the negative, the judgment of this court must be against the right of the plaintiff to require a discharge of the mortgage held by the defendant.

It is not insisted that there is any express power given to congress, by the constitution of the United States, to pass such a law.   It would be in vain to search in that instrument for any language granting such an express

power. It is believed by the counsel for the plaintiff, and I may add, by many learned judges and lawyers, as well as by senators and representatives, that the power to pass a law of the character indicated, is justly and properly to be implied in order to carry into execution other powers of legislation expressly granted to congress by the constitution. It must be conceded that the express powers given to congress by that instrument, have been greatly enlarged by the admission of others by implication.

It is not proposed to enter into any extended consideration, here, of the express powers conferred upon congress by the constitution. The subject has been fully and satisfactorily reviewed in the opinions of my learned associates in this case. I entirely concur with them in their reasons, as well as in their conclusions; but in respect to a question of such momentous bearing upon the property and personal rights of the people, there seems to be a propriety that some, at least, of the reasons which have controlled me should be indicated, although I can hope to add but little to the argument.

The highest judicial tribunals concur that the authority to pass laws in congress cannot be implied, except for the purpose of carrying into execution some express power which might otherwise fail of its full effect.

The authority for the exercise of powers by implication is expressly given by the constitution, and, I may add, it is there limited, as well as defined.

The language there used is, " to make all laws which shall be necessary and proper for carrying into execution the foregoing powers."

The implied powers to make laws cannot, however, be invoked, when the act proposed is prohibited, or is inconsistent with some other provision.

The implied power to pass the act in question has been referred to various express powers, according to the ingenuity or learning of its advocates.

It has been attributed to the power to borrow money—to that authorizing congress to raise and support armies—to provide and maintain a navy—to erect forts, &c., for war purposes—to impose taxes, &c.—to regulate commerce—to coin money and regulate its value—to provide for the common defence and general welfare of the United States—to every power that authorizes the expenditure of money.

It would not be difficult, I think, to show that these powers can be fully executed, as they have been for years, without any necessity or propriety for an act of congress making governmental promises to pay money a legal tender for the payment of debts between private persons.

The most vigorous and plausible arguments offered have defended the act in question under the war power, and the power to regulate commerce. But neither of these powers, " for the necessary and proper execution thereof," require the interference of government to compel private persons to accept treasury notes in settlement of their transactions between themselves.

The constitution has enjoined upon congress a plain duty, which is wholly inconsistent with the results necessarily to be produced by the act in question. I refer to the obligation to furnish a uniform currency. The power to coin money and regulate its value is one of the express powers conferred upon congress, while to the states it is prohibited to exercise it. The several states are restricted, in the passage of laws directing what shall be a legal tender for the payment of debts, to gold and silver, while no express authority whatever is delegated by the federal constitution to congress upon that subject. The object to be attained by the arrangement of these provisions, it is well settled, was the establishment of a uniform currency. (*Story's Com. on the Const.*, §§ 548, 689, 694, &c., *abridged ed.*)

Treasury notes are in no sense a uniform currency. The act has now been in force over one year, and during all that time it has been the value of gold or silver coin, esti-

mated in treasury notes, which has regulated the price of commodities. The price of commodities shrinks or swells as the price of coin advances or recedes, compared with treasury notes. Ever since the formation of the government, money has been coined from gold and silver, under the authority of laws enacted by congress, and such coin has hitherto constituted the standard currency of the country. That currency is still in use as money, not forbidden by any law. It has been and still is a uniform currency. While coin is still in lawful use as money, the act of congress has declared that treasury notes shall also be money, and a legal tender for the payment of private and public debts. The two kinds of money do not hold the same relative value. Are treasury notes the money of which the value is to be regulated by congress under the constitution? In my opinion they are not. The government may " coin money and regulate the value thereof." It is not notes or promises to pay money that is here referred to. The question need not be argued that these two kinds of money furnish no uniform currency. Nor is it necessary to examine dictionaries to define the conventional meaning of the words " coin ". and " money." Coin possesses intrinsic value when made of the precious metals known to commerce. Money, in the sense in which it is used in commercial transactions, may be coin, or the printed and written promises to pay money, made by the government, or by banking institutions, or bankers of known credit, which the community believe may .be converted into coin at a known or probable market rate. Such promises, when of well known and accredited character, do pass by consent as money. But they are not the money mentioned in the constitution, which the general government alone is authorized to coin, and to regulate the value thereof, and which it is forbidden to the several states to fabricate. The distinction between the two kinds of money is easily perceived. The treasury note is but a promise to pay money, upheld

alone in its currency by the ability of the government to redeem it, and perhaps also by the lawfulness of the attempt to compel it to be received in payment of private debts. Coin is not a promise or an obligation, but is itself the thing called money.

The stamp announces the denomination of the coin, and it passes and has credit for the value or sum declared and stamped upon its face. When it is coined and issued, the government have parted with a thing of actual value, which has cost about the sum impressed upon it.

When the government satisfy the people that the revenue will be sufficient to insure the redemption of the notes, no law will be required to compel the private creditor to accept them in payment from his debtor. If the government have no such resources of revenue, immediate or prospective, as will justify the reasonable hope of the public that the treasury notes will be redeemed, they can possess no uniform credit or currency.

The question is not whether government may emit or issue treasury notes. The right to do so is conceded to be one of the important powers which the government may exercise by implication. But it can afford no argument to sustain the act compelling these notes to be received in payment for private debts, that this conceded power by implication to issue notes will be aided by implying a power to make them a legal tender. There would be no boundary to implied powers, if this position were admitted, and a written constitution would cease to be of any importance. Written constitutions are not to be wrenched from their natural import by casuistry, or to suit the temporary convenience of the times. Certainly not when their interpretation is submitted to the judiciary. If our constitution is in any respect to be wrested from the obvious meaning attributed to it for seventy years, let it be done by the military alone, when civil jurisdiction is suspended, and not under the pretence of enacting a law.

Powers are implied, as before observed, only when they are " necessary and proper for carrying into execution some express power ;" not for the purpose of executing an implied power. The purpose for which the legal tender provision was adopted may be a good criterion by which to ascertain the proper express power under which the power sought to be implied must be exercised, if at all.

The object, so far as it relates to private debts, was, I think, to secure for the treasury notes a currency which would supersede the necessity of borrowing money or coin for the use of the government.

By declaring treasury notes to be money, if it can legally be done, the necessity for borrowing is overcome, and the government can make it in billions at a trifling expense, as compared with the slow and expensive process of acquiring and coining the precious metals. The object was not to regulate commerce, nor to coin money, nor to raise or borrow money. The relation of treasury notes to the regulation of commerce, or to borrowing money, is indirect and consequential, if any exist.

The government neither borrow or raise money, nor is it directly benefited by compelling its citizens to accept treasury notes in payment of private debts. The private creditor loses, but the government do not receive what he has lost. If the loss of the private creditor were received by the government, it would be a forced loan. Although unlawful, the hope of repayment would then remain, because, having received the consideration, the government would be under an equitable obligation to make payment.

The power to regulate the currency, if it exists, is an implied power, derived from the provision authorizing the coinage of money and the regulation of the value of the coin, and the prohibition to the states of the right to make anything but gold and silver coin a legal tender for the payment of debts. These powers were incorporated into the federal constitution to impose the duty upon the gov-

ernment of furnishing a uniform currency, and, in effect, thereby to regulate it, so far as it is or can be regulated by uniformity.

It seems to me idle to attempt any demonstration of the position that the printing of treasury notes, or the promises of the government to pay money, is not, in any reasonable sense, a coinage of money. Upon such a principle, if acknowledged, the government might in a short time find it desirable, and would, perhaps, claim the right, under some implied constitutional prerogative, to restrain all banking institutions from issuing any promissory notes to circulate as money, in order to preserve the currency of the treasury notes with the public.

Treasury notes do not constitute a uniform currency. Two kinds of money are now in circulation. One, the hard money known to the constitution; the other a paper money, deriving its character as money solely from a statute that forfeits the rights of the private creditor, whenever he insists upon payment in the coin mentioned as money by the constitution.

The value of treasury notes fluctuates from day to day, as the prospect of the amount required to be issued for the convenience of the government increases or diminishes, or as the probable resources of the government keep pace with its growing liabilities.

The right of the private creditor to insist upon his time-honored and guaranteed privilege under the constitution to be paid in coin, has been violated.

The creditor is despoiled for the benefit of the debtor. The currency of the country, if such it be, is debased. Commerce is paralyzed, for the trader, the manufacturer or the contractor knows not what price the merchandise which he contracts to-day to purchase, make or deliver, will bear a month hence.

It seems clear to me that the act in question is incon-

sistent with the duty imposed by the constitution upon the government to furnish a uniform currency. The power to make such a law cannot be implied. It has no existence.

Laws can be enacted only for the general welfare. This one operates injuriously upon the creditor portion of our citizens. It gives to the debtor advantages for which he affords to his creditor no equivalent.

Congress may not weigh or balance its discretion in the exercise of implied powers, except where they are necessary or proper for the execution of express powers. None are given, in my opinion, which can sustain this act by implication, because it is subversive of the paramount obligations to furnish a uniform currency.

I concur fully in the opinion of Justice INGRAHAM, in this case, in respect to the operation of the act of congress upon prior contracts. It clearly impairs the obligation of such contracts. That branch of the case has been so fully considered by him, that I deem it unnecessary to add anything to what has been already so well said.

Reference is due to the decision recently made by the justices of this court, in the seventh district, where those learned justices have arrived at a different judgment upon this question, although the decision is not yet to be found in any volume of reported cases.* While I concede that uniformity of decision throughout the state is desirable, and that the leading decision upon a new question ought generally to be regarded as the ruling precedent until it has been reversed or overruled, it is obvious that the right of dissenting from an erroneous decision cannot reside only with the justices of the district where it was pronounced.

The circumstance that the leading opinion in this case was prepared before the decision in the seventh district was pronounced, and my conviction that the principles upon which that case has been decided are wholly untena-

---

* Since reported, ante, p. 17.

ble, impels me to concur with my brethren who heard this case, in disregarding that decision as controlling authority here.

The defendant must have judgment, with costs.

PECKHAM, J.   I concur in the result of the opinion of the chief judge.   The clause in the act of congress, now under consideration, reads as follows :  " That the secretary of the treasury is hereby authorized to issue, on the credit of the United States, $150,000,000 of United States notes, not bearing interest, payable to bearer, at the treasury of the United States, and of such denominations as he may deem expedient, not less than $5 each, provided that such notes herein authorized shall be receivable in payment of taxes, internal duties, debts and demands of every kind due to the United States, except duties on imports, and of all claims and demands against the United States of every kind whatsoever, except for interest upon bonds and notes, which shall be paid in coin, and shall also be lawful money and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest as aforesaid."

It is insisted that congress had no constitutional authority to pass this law, so far as respects the clause that makes these notes "lawful money and a legal tender for private debts."

Congress is not sovereign on all subjects of legislation. So far as the constitution of the United States vests power in congress to legislate, it is supreme and absolute, but no further.   The tenth article declares that " the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

The power to pass this law, then, must have been affirmatively conferred upon congress in terms, or it must be, under another clause in the constitution, " necessary and

proper for carrying into execution" the powers expressly conferred.

Has congress the power to pass this law, making its notes money and a legal tender for private debts ?

The provisions of the constitution bearing directly upon the subjects of what is money, and what power may fix its value, are the following :

The eighth section of the first article provides that " congress shall have power to coin money, regulate the value thereof and of foreign coin, and fix the standard of weights and measures."

The tenth section of the same article provides that "no state shall coin money, emit bills of credit, make anything but gold and silver coin a tender in the payment of debts, pass any bill of attainder, *ex post 'facto* law, or law impairing the obligation of contracts."

These are all the provisions of the constitution in terms touching this power.

It is insisted here that this provision " to coin money " confers in terms the power to make paper money. That the power of the government is confined to coin is proved : 1. By the plain meaning of the words. 2. By their constitutional meaning, as used in the constitution. 3. By the undisputed interpretation of all courts and commentators up to the passage of this act. 4. By the history of this clause of the constitution, showing that its framers intended to exclude paper money and all power to issue it. 5. By the evils to be remedied. 6. By the universal practice of the government, from its organization up to the passage of this act, in harmony with this view.

Counsel insist that the definition of money, as given in the dictionaries, includes paper as well as coin. I understand it entirely otherwise. The words " to coin money," when used together, have never, so far as I can learn, in any place, by any commentator, court or linguist, been used to express or refer to anything but coin.

Many things are frequently called money, and used for or in the place of money. Coin alone is regarded as money " among all modern commercial nations."

" To coin," means " to stamp a metal and convert it into money ; to mint."

But it is said by counsel, and correctly too, that " to coin " sometimes means to make, as " to coin words ; " and I may add, " money " also means " wealth." Then congress would have power to make wealth, and its power in all that department would be without limit. Thus it could monopolize all the mercantile business, arts and trades, as well as the farming of the country, to attain that end. To such absurdities does a departure from the plain sense of the constitution readily lead.

Again, " to coin money " refers to coin, and to coin only, not alone in the English language, in its plain and natural sense, but in the language of the constitution as there used.

Counsel concede, as the truth is, that these treasury notes are " bills of credit." They are so referred to in the constitution, they are there called " bills of credit," but they are never called money. To congress is given power " to coin money." The states are forbidden " to coin money " or " emit bills of credit," thus referring to bills of credit as to a different thing from money ; otherwise, prohibiting the coining of money would, of itself, have prohibited the issuing of bills of credit. To congress is given power " to coin money, regulate the value thereof and of foreign coin." The words, " to regulate the value thereof," not only in their connection but their sense, plainly refer to the regulation of the value of coin, not of bills of credit. Is it not almost an absurdity to speak of regulating the value of a note issued by government ? It is appropriate language when applied to coin. Government may regulate its value, but a treasury note, like any other promissory note, always promises to pay something, expressly or by

Meyer agt. Roosevelt.

implication, and its value will ever chiefly depend upon the responsibility of its makers. Coin promises nothing; its value is regulated and stamped upon its face.

Again, until the passage of this act, I believe it had never been supposed by any court, or by any judge of any court, that this power " to coin money " had reference to anything but to a metallic currency.

They have been regarded as so plain and clear that judges and commentators upon the constitution have uniformly assumed them to refer to coin only.

Mr. Justice DANIEL, in delivering the opinion of the supreme court of the United States in reference to the provisions of an act of congress punishing the offence of importing spurious coin, said : " They " (the provisions of the act) " appertain rather to the execution of an important trust invested by the constitution, and to the obligation to fulfill that trust on the part of the government, namely, the trust and the duty of creating and maintaining a uniform and pure metallic standard of value throughout the Union. The power of coining money and regulating its value was delegated to congress for the very purpose, assigned by the framers of that instrument, of creating and preserving the uniformity and purity of such a standard of value, and on account of the impossibility, which was foreseen, of otherwise preventing the inequalities and the confusion necessarily incident to different views of policy, which in different circumstances would be brought to bear upon this subject." ( *United States* agt. *Marigold*, 9 *How. U. S. R.*, 560.)

Mr. Justice STORY, in his commentaries on this clause, says: " The grounds upon which the power to coin money and regulate the value of foreign and domestic coin, as granted to the national government, cannot require much illustration to vindicate it." So plain did Justice STORY here regard the clause as referring to coin, that he refers to it according to its sense and meaning, as to coin money,

"and to regulate the value of foreign and domestic coin," instead of using the literal words of the constitution, viz: regulate the value "thereof." Further, he adds: "The object of the power is to produce uniformity of value throughout the Union, and thus to preclude us from the embarrassments of a perpetually fluctuating and variable currency." (2 *Story Com. on Constitution*, § 1118.)

I make more comment on this provision than it seems to me to deserve, because one of the judges of the seventh district, where this act in all its parts has just been held to be constitutional, bases his opinion chiefly upon the clause "to coin money," insisting that that clause gave power to issue paper money. But his colleague, though arriving at the same result, repudiated the position and proved its fallacy. After referring to the clause giving power to congress to coin money, &c., and to the prohibition to the states to coin money, emit bills of credit, make anything but gold and silver coin a tender in payment of debts, &c., he says: "These two provisions, construed together, most conclusively show, I think, that it was the purpose of the framers of the constitution to give to the national government exclusive control of the currency of the country, and to secure thereby one currency for the whole country, one national uniform currency. But that currency most evidently was to be a metallic one. The money of the constitution it seems to me very clear was to be hard money, metallic money. It was to be coined from metals which had an intrinsic value in commerce throughout the civilized world."

Other reasons confirming this view will be given in another place, as they cover broader ground.

But if the power to make these notes a legal tender for private debts, in other words, to make them money, be not found in the clause under consideration, it is insisted that it is found in the general clause giving to congress power

to pass " all laws necessary and proper far carrying into execution " the express powers granted to them.

This clause has never been regarded by lawyers or judges as conferring any additional powers whatever upon congress.

Hamilton, in the thirty-third number of the Federalist, in discussing this clause, and answering objettions to it, said : " And it is expressly to execute these powers" (the special powers granted by the constitution) " that the sweeping clause, as it has been affectedly called, authorizes the national legislature to pass all necessary and proper laws.  If there be anything exceptionable, it must be sought for in the specific powers upon which this general declaration is predicated.   The declaration itself, though it may be chargeable with tautology or redundancy, is at least perfectly harmless.   But suspicion may ask, why then was it introduced ?   The answer is, that it could only have been done for greater caution, to  guard against all caviling refinements in those who might feel a disposition to curtail and evade the legitimate authorities of the Union."   What specific power, then, is this law necessary and proper to execute ?   It is insisted that this power is " necessary and proper" to execute nearly all the powers expressly conferred upon congress.   It is claimed as necessary and proper to execute the power,

I.  " To levy and collect taxes," &c.

II.  " To borrow money on the credit of the United States."

III.  " To regulate commerce with foreign nations and among the several states," &c.

IV.  " To regulate the value of money."

It might, perhaps, with equal plausibility be claimed under the clause giving to congress the power,

" To raise and support armies," or

" To provide and maintain a navy."

Indeed, I perceive it is claimed under the two latter

clauses, in a great degree, in the opinion of Judge Smith, in the case before referred to.

I. As to the power to levy and collect taxes. All the interest the government has in the collection of taxes is, to see that they are collected in some proper medium. If they may receive something else as money, then they may be interested in deciding what they shall so receive. That has no connection with or relation to what private persons shall receive for their dues, and therefore a law as to what private persons should receive for their demands could not be necessary or proper to collect taxes.

II. To borrow money on the credit of the United States.

Considerable stress is laid upon this clause as a foundation for the exercise of the power to pass this law. The argument is, that money is absolutely necessary to raise and support armies and to provide a navy. It is not claimed under the power to raise armies and provide a navy, upon any other ground than upon the necessity of having money for these purposes, and that the aid of this act is " necessary and proper" to borrow it. It therefore all reverts to the power to borrow money. This statute enacts and declares that these treasury notes shall " be lawful money." The argument then must be, that money is necessary to borrow money. The government must make or emit a large amount of " money," with a view to use to borrow the same thing, viz., a large amount of money. If these treasury notes be in fact and in law money, there is surely no occasion for borrowing at all. The government has only to issue as much as it may desire. It is therefore only by assuming that this act is untrue in fact and in law ; by assuming that these notes are not money, that the question can arise whether, under the power to borrow money, congress can enact that these bills shall be a legal tender for private debts. In that case, however, the other difficulty arises. If it be admitted that they are not money, can there be any pretence of authority for declaring them

a legal tender for private debts? Could congress enact that all private debts should be canceled by the payment of one-half of the amount due? Such a power would scarcely be claimed. Have they any more power, then, to do the same thing indirectly, by declaring treasury notes to be a payment, conceded for this purpose not to be money, when they are not worth in market more than one-half of the debt? I said that the power to declare the extinguishment of private debts by the payment of one-half, could scarcely be claimed, yet I am told that there is no prohibition to congress to the exercise of such a power, and therefore congress may exercise it. But the answer, in the language of General Hamilton, is plain. " Why declare that things shall not be done, which there is no power to do? Why, for instance, should it be said that the liberty of the press should not be restrained, when no power is given to which restrictions may be imposed." (*No.* 84 *of Federalist.*)

But it is said that congress has power to impair contracts in cases of bankruptcy, and that the power to do so in that case has been judicially recognized. Why? Because the power to do so was expressly granted by the constitution, so far as " uniform laws on the subject of bankruptcies" would have that effect. The power to do so, otherwise or further, was expressly denied by the learned judge who gave the opinion of the court, per COWEN, J., (*Kunzle* agt. *Kohans,* 5 *Hill,* 317.) That case, then, is an authority against the plaintiff, as it holds that congress cannot pass a law impairing the obligation of contracts, except by express authority. It cannot, as is claimed here, do so by implication.

But the clause is to borrow money on the credit of the United States. Is this part of the law, making the notes a legal tender for private debts, in any respect the " credit" of the United States? It is claimed and declared to be money. Could the framers of the constitution ever have regarded such an enactment as a legitimate mode of bor-

rowing money on the credit of the United States ? as having any relation as a means of using the credit of the United States to borrow money ?

I think it cannot be so understood.   No credit is had or used—as the notes are payable on presentation, not on time. It is no more an exercise of the power to borrow money than would be the coining and issue of gold coin.   The act of borrowing money by a government or an individual, and giving a note therefor, is radically different from the act of issuing money to loan or to pay to others.   Congress has power to establish post-offices, &c.   Appurtenant to that, and to preserve and sustain it, belongs the power to charge postage.   Congress may well declare in what it will receive pay for transporting letters, in stamps, silver, copper or bills.   But it could not, under that power, declare what should be money and a legal tender for private debts, nor attempt to regulate the currency of the country among individuals.   It would not be appurtenant to the subject, any more than such a power would be appurtenant " to borrowing money on the credit of the United States," or to the " laying and collecting of taxes."   If declaring these notes to be a legal tender, and money, &c., could be regarded as a means of borrowing money, still the act would be unconstitutional, because the constitution, as I have sought to show by reason and authority, has expressly provided and declared what shall be money—that coin alone shall be money.   It would violate all rules of construction to say that general and uncertain words in another clause, on another subject, should nullify this express provision.

Again : why could not congress enact that on failure to pay these treasury notes, the holder might levy upon and sell any town or city, and all the property therein, or so much as might be necessary to satisfy the notes, and that on such sale the purchaser should have a good title ? Because the mode and means of raising the money are pointed out by the constitution.   The citizen may be com-

pelled to pay the last dollar of his means. The debts of the general government are a mortgage upon every dollar of real and personal property of every citizen of our country. But this property must be converted into money, must be applied, under and pursuant to the provisions of the constitution, by " taxes, excise," &c. The constitution has made express provision for the mode of taking the property of the citizen " to pay the debts," &c. of the United States; and if no prohibition were found against taking it otherwise, the right to do so would never be implied or inferred from general and doubtful words in another provision upon another subject. So in reference to this act that declares these notes to be money and a legal tender, &c., the constitution, as I have endeavored to show, has expressly declared what shall be money—that coin should be money. There is an implied prohibition against anything else being made money by congress.

Again : it is said in the able opinion of one of the judges in the case before referred to, that he concurred in the remarks of Senator Sumner, that " it is difficult to escape the conclusion that if congress is empowered to issue treasury notes, it may affix to them such character as shall seem just and proper, declaring the conditions of their circulation, and the dues for which they shall be received." I cannot concur in that view, and never heard of any such principle of law. Any corporation, municipal or otherwise, having power to borrow money might, upon such a principle, just as well do the same thing.

The power to give a note to secure money borrowed, and the power to declare that note a legal tender for private debts, are radically different powers, and have no necessary connection whatever. The statement of the proposition is its answer.

The claim of authority under the power to regulate commerce " with foreign nations and among the several states," I do not think sufficiently plausible to require any remarks,

and Judge SMITH, in his leading opinion, having found nothing in that provision on which to base this power, I do not feel called upon to examine it.

To the provision "to regulate the value of money," of coined money, I have already alluded, as plainly having reference to regulating the value of coin. So congress has practically interpreted that clause for three-quarters of a century, making coin only a legal tender. In truth, it became a legal tender by being made money, and the law merely declared a legal consequence—the exigency that demanded this provision, the evil to be remedied, shows the intention of the constitution not to grant to congress power to issue paper money. At the same time this provision was adopted, if there were one evil complained of more than another, it was the worthless paper currency that afflicted the country.

Upon this Mr. Justice STORY remarked : "The history of such currency constituted the darkest pages in American annals, and had been written in the ruin of thousands who had. staked their property upon the public faith, always freely given, and but too often grossly violated." (*Briscoe* agt. *Bank of Ken.*, 11 *Peters* [*U. S.*] *R.*, 310.)

The evils of a paper currency the framers of the constitution intended to avoid and prevent. Under such circumstances, it cannot be alleged, I think, with much plausibility, that they designed to sanction or authorize such a currency thereafter.

The cotemporaneous history of these provisions is to the same effect, and is correctly stated by Judge SMITH as follows :

"The original section drafted and proposed to the convention, which provides that congress may borrow money, reads as follows : 'To borrow money and emit bills on the credit of the United States,' the words, 'and emit bills' were stricken out, upon discussion, on the ground that they might seem to warrant or authorize the issuing of paper

money by the government." (3 *Madison Papers*, 1344.) Mr. Wilson, who was a prominent member of the convention, said: "It would have a most salutary influence on the credit of the United States to remove the possibility of paper currency." Mr. Langdon said he had rather reject the whole plan, than retain the words, " and emit bills." The words were stricken out by a vote of nine states to two.

The practical construction of the government denies this power. This government, under this constitution, had been in operation over three-quarters of a century prior to the passage of this act. Its pecuniary necessities had sometimes been very great. During the last war with Great Britain, then probably the most powerful nation on the earth, the treasury notes of the United States were at a discount of fifty per cent. But during all that time, and until the passage of this act, no attempt to exercise any such power has ever been made.

This cannot but be regarded as a strong practical interpretation by the framers of the constitution and their successors, that the power asserted by this bill of making notes " money" and a legal tender for private debts had no authority in that instrument. Many acts have been passed by the congress since 1812, authorizing the issue of treasury notes, and they generally, if not universally, (excepting those passed by the late congress) were made receivable for all debts due the government, but never for debts due to individuals. It has been said that making these notes receivable for debts due to the government, was an exercise of the power to make them a legal tender for private debts. To my mind, the acts have not the most distant analogy. Congress has express power " to dispose of " the property of the United States ; to decide that they will receive other than money in payment of debts to the government; has always exercised such power ; has released such debts without any or with only part payment. Can it be pretended

that because one has a right to say what he will recive in payment of his own debt, therefore he has the power to declare what others shall receive in payment of their debts? Yet that is the precise breadth of the argument.

So the notes of the United States Bank were made receivable for debts due to the government, for public lands, &c., but never between individuals. Yet such a privilege might easily have been conferred upon the bank, and, in the conscientious judgment and conviction of many, would no doubt have been regarded as judicious legislation, if any such power had been supposed to exist in congress.

In fact, I feel entirely safe in saying that when this provision of this bill was first proposed in congress, it struck the great mass of intelligent men of the country, laymen as well as lawyers, as being wholly unauthorized by the constitution.

It is also said that it is of little moment that congress should be forbidden the power to issue treasury notes as money, when they are authorized to debase the coin to any extent they choose, and may thus attain the same end, though by a less beneficial and practical measure.

In the first place, I deny the right or power of congress to destroy, under an authority " to regulate " and preserve. The framers of the constitution intended to provide a metallic currency from the precious metals known and appreciated among all civilized nations. To coin three parts lead and one part gold into money, stamp it as money, and declare it to be gold by law, or equal to gold, would not only be futile, but would be a fraud upon and a gross prostitution of the power to coin money. If it be within the letter, it is wholly foreign to the spirit of the constitution.

But in the second place, such a measure would be impracticable in the present age. It would be the same species of legislation as the act under consideration, but not so specious or insiduous. To debase the current coin of the

realm, (not in good faith to regulate it,) would be an act of barbarism belonging to past ages, and in no more danger of being revived at this day, and in a civilized land, than there is of establishing the worship of Egyptian idols. Therefore that power required no qualification.

Thus, from the language of the constitution, its grants of power, its prohibitions to the states, the evils to be remedied, viz: delivery from " the pestilent effects of paper money," the uniform practice of congress, it is plain that the constitution intended to vest in congress " the power and the duty of establishing a uniform and pure metallic standard of value throughout the Union, which should not be subject to the ruinous fluctuations always incident to paper money.

One of the judges in the seventh district says very truly : " The prohibition to the states against issuing bills of credit, and the refusal of the convention to give to congress express power to issue such bills, must be deemed, I think, indicative of the purposes and intent on the part of the framers of the constitution to give to nothing the character and quality of money except gold and silver and other precious metals."

And yet issuing these treasury notes to circulate as money, is confessedly " emitting bills of credit," declaring them to be money and a legal tender, is confessedly giving them the " character and quality " of money.

Is it not, therefore, confessedly a plain violation of the constitution ?

Mr. Justice Story says the history of paper money in the American colonies and states is often referred to for the purpose of showing that one of its great mischiefs was its being made a legal tender in the discharge of debts. (2 *Story's Com. on Const.*, § 1366.) Then he adds that the prohibitory clauses in the constitution to the states as to coining money, emitting bills of credit, and tendering anything but gold and silver in payment of debts, " are founded

upon the same general policy." The policy is to provide a fixed and uniform value throughout the United States. That these prohibitions " are essential to the establishment of a uniform standard of value in the formation and discharge of contracts." (*Same*, § 1372.)

Yet this general policy for establishing a fixed and uniform standard of value " in the formation and discharge of contracts " is utterly abolished by this bill, which puts this fluctuating paper money in the place of the money of the constitution, which makes a new standard of value for " the discharge of contracts,"—a standard radically different from the "fixed and uniform " standard of the constitution.

One of the judges in the seventh district seems in a degree to place this power on the power to carry on war. He insists that the government may seize private property for the war, may take private ships to make a navy; and if they may do that, they may also, if they deem it necessary and proper to do so, make their notes a legal tender for private debts.

The connection between the two powers is not seen. If property be thus taken, if ships are thus taken for public use, the owner has a claim on the government for their full value, as the constitution declares that private property shall not be " taken for public use, without just compensation."

But if there be any analogy in the cases, if the tender of these notes, at nearly fifty per cent. discount, in the payment of private debts contracted before the passage of the act, thus making the creditor receive fifty cents in payment for a dollar, can be regarded as taking private property for public use, then such creditor would have a claim on the government for the amount thus taken from him by force of this law.

But it is not pretended that he would have any such claim. His rights and property are taken from him without compensation. It is naked injustice to him, perhaps,

without the consolation of believing that the public good is promoted by the sacrifice, as it is more than doubtful whether such enactments tend to preserve the notes from depreciation. In the south, it is said, the so-called Confederate congress has passed a legal tender law, but it requires some six to ten dollars of their notes to buy one dollar in gold.

Congress, in our revolutionary war, in addition to declaring that their notes ought to be a tender in payment of all debts, and recommending the states to pass such tender laws, resolved that, whoever should refuse this paper in exchange for any property " as gold and silver, should be deemed an enemy to the liberty of these United States." " This course of violence and terror," says Mr. Justice STORY, " so far from aiding the circulation of the paper, led on to still further depreciation." (2 *Story on Const.*, § 1359.)

As to past debts the act is simply unjust; as to the future, it is of less consequence, as the owner of property will adjust his price to meet the depreciation of paper.

Again : one of the judges in the seventh district says : " It is, as I conceive, a fundamental mistake that the government of the United States does not possess as full, ample and extensive powers to provide for the ' general welfare and the common defence ' as any other government existing among men. It possesses for this purpose, all the original inherent power of the people to protect themselves, and to provide for their self-preservation and general welfare."

Again : " The powers of our government are none the less ample because they are enumerated in a written constitution. The essential powers of governments are substantially the same under all forms of government, and are delegated and entrusted to rulers to be exercised alike for the common good." He further insists that this power may be exercised upon the principle that the " safety of

the people is the supreme law, and is the universal rule among all nations in time of war."

The learned judge seems to have supposed that some unlimited powers were conferred upon the general government by the terms " common defence" and " general welfare," used in the constitution. It was attacked by its enemies at the time of its adoption on that alleged ground, and Mr. Madison gave the answer, clear then as now, among other things, as follows :

" It has been urged and echoed, that the power ' to lay and collect taxes, &c. to pay the debts and provide for the common defence and general welfare of the United States,' amounts to an unlimited commission to exercise every power which may be alleged to be necessary for the common defence or general welfare. No stronger proof could be given of the distress under which those writers labor for objections, than their stooping to such a misconstruction.

"Had no other enumeration or definition of the powers of congress been found in the constitution than the general powers just cited, the authors of the objection might have had some color for it ; though it would have been difficult to find a reason for so awkward a form for describing an authority to legislate in all possible cases. A power to destroy the freedom of the press, the trial by jury, or even to regulate the course of descents or the form of conveyances, must be very singularly expressed by the terms ' to raise money for the general welfare.'

" But what color can the objection have, when a specification of the objects alluded to by these general terms, immediately follows, and is not even separated by a longer pause than a semicolon ? If the different parts of the same instrument ought to be so expounded as to give meaning to every part which will bear it, shall one part of the same sentence be excluded altogether from a share in the meaning, and shall the more doubtful and indefinite terms be

retained in their full extent, and the clear and precise expressions be denied any signification whatever ? For what purpose could the enumeration of particular powers be inserted, if these and all others were meant to be included in the preceding general power ? Nothing is more natural and common than first to use a general phrase and then to explain and qualify it by a recital of particulars," &c. (*No.* 41 *Federalist.*)

The propositions of the learned judge just referred to, adopted in practice, would constitute a despotism of the most absolute character. No monarchy could be more absolute. Such doctrine nullifies all written constitutions. It abolishes all distinction between this government and those of Austria and Turkey.

" The public safety" and " the general welfare," to be determined by the discretion of congress, destroy all limits to congressional power. Their discretion only is thus made the measure of their authority.

Hamilton was not what is called a strict constructionist of the constitution. He was as latitudinarian as any. He put an extreme case, as confessedly beyond the jurisdiction of congress.

" Suppose," said he, " by some forced construction of its authority (which indeed cannot easily be imagined) the federal legislature should attempt to vary the law of descent in any state, would it not be evident that in making such an attempt it had evaded its jurisdiction and infringed upon that of the state ?" (*No.* 33 *Federalist.*)

Yet this doctrine would enable congress to pass that law. The argument would be : We are at war. The nation wants men. The law of primogeniture would send the younger sons here, as in England, to the army, for a livelihood. Therefore enact it.

A like reason, the supply of men, would authorize polygamy in the states by an act of congress.

On the contrary, in my judgment what congress may do

to provide for the public safety and the general welfare the constitution plainly points out; what that instrument has not given congress power to do, its framers deliberately determined would not promote the public safety or result in the general welfare. That true statesmanlike wisdom would not adopt any measures not authorized by that constitution.

In adopting it, the states and the people expressed the same conviction and belief.

But it is said that this law is "an imperative governmental necessity," and that "the necessity creates the law;" that it is necessary to save the country in this its hour of great peril.

Is this more than mere generality? By what authority or with what propriety or force is such an assertion made in the face of the history of such measures in our own country, which Justice STORY says has been written "in the ruin of thousands;" in view of the fact that the framers of our constitution, fresh from the experience of the evils of such legislation, refused to give power to congress to revive them; in the face, too, I believe I am safe in saying, of the judgment of every writer on political economy of the present century; and in the face of facts historically proved and this day experienced, that such legislation has no effect towards keeping up the credit of the bills, none whatever as to future debts, and that it is single, unqualified injustice as to debts theretofore incurred?

The position is a mere assumption. Such claims have always attended all unconstitutional legislation. Was an unconstitutional act ever proposed or adopted that was not, in the judgment or assumption of its advocate, indispensable to the "public welfare," or "the public safety?"

"To relieve the distress of the community," says Justice McLEAN, (in Briscoe agt. The Bank of Kentucky,) "or the wants of the government, has been the common reason

for the increase of a paper medium, at all times and in all countries. When a measure of relief is determined on, it is never difficult to find plausible reasons for its adoption. And it would seem, in regard to this subject, that the present generation has profited but little from the experience of past ages."

The sound, true principle applicable to written constitutions, declares that it is wiser and safer for the country to be guided by what the constitution has provided for the safety and welfare of the country, than to trust to the discretion of congress—to the expedients which the excitement of the hour may suggest. If authority for the proposed measure be not found in that instrument, sound principle and true patriotism alike declare that it is not wise or safe, and no obligation or authority whatever can be given or imposed by the enactment of such a law.

According to this doctrine of the learned judge, it would be constitutional for congress to abolish the constitution and establish a monarchy, if in their judgment it was necessary to save the country.

There is probably no right minded man in this land who would not be willing to submit to any sacrifice, or to do anything in his power consistent with integrity and honor, to put down this rebellion and save his country, nor is there probably any such man who would not regard the division of his country as substantially the loss of his country.

Yet no such man could be called upon as a judge for any purpose to declare that to be true which he believed to be false.

Congress may deem it wise, may deem it a great governmental necessity to do here what was occasionally done in Rome, viz : appoint a dictator with despotic power " to see that the republic receive no detriment." But the courts could scarcely be expected to pronounce such a measure constitutional.

But it is said that the courts have no power to inquire into the degree of the necessity of any law.

No such authority is claimed. The rule of interpretation applicable to that clause of the constitution which authorizes congress to pass all laws necessary and proper to execute the powers expressly granted, has received judicial construction in various cases in the United States court. A liberal rule was laid down by Chief Justice MARSHALL, which is, that the law enacted as a means to execute such a power should be "appropriate, plainly adapted to that end, not prohibited, but consistent with the letter and spirit of the constitution." (*McCulloch* agt. *State of Maryland*, 4 *Wheat.*, at p. 482.)

To the same effect is the opinion of General Hamilton given to President Washington upon the constitutionality of a bank of the United States.

"The degree in which a measure is necessary can never be a test of the legal right to adopt it. That must be a matter of opinion, and can only be a test of expediency; the relation between the measures and the end, between the nature of the means employed towards the execution of a power and the object of that power, must be the criterion of constitutionality, not the more or less of necessity or utility." The doctrine contended for "does not affirm that the national government is sovereign in all respects, but that it is sovereign to a certain extent; that is, to the extent of its specified powers. It leaves, therefore, a criterion of what is constitutional and what is not so. This criterion is the end to which the means relate as a means. If the end be clearly comprehended within any of the specified powers, and if the means have an obvious relation to that end, and is not forbidden by any particular provision of the constitution, it may safely be deemed to come within the compass of the national authority.

There is also this further condition, which may materially assist the decision.

Does the proposed measure abridge a pre-existing right of any state or of any individual? (*Hamilton's Works*, 4th vol., 105, &c.)

But Gen. Hamilton claimed no more power under this clause than congress would have had without it. This appears by his writing in the *Federalist*, before quoted, and also in his opinion just referred to.

The courts, then, have the right to inquire whether the law has a " plain adaptation" or " obvious relation" to the execution of any specific power, and whether it is consistent with the " letter and spirit " of other provisions of the constitution.

In conclusion, I think it quite plain and clear:

1. That congress has no express power to make these notes a legal tender for private debts. The power to coin money and regulate the value of foreign and domestic coin, was confined in terms and intent to coin, to metallic money. If congress have any power to pass a tender law for private debts, it was obtained from the clause, to regulate the value of coin, as an incident of the power to regulate, and is confined to coin, to hard money, or as a learned judge terms it, " constitutional money."

2. Congress has no power to make anything but money a legal tender for private debts. This law assumes to be based upon that position, and therefore enacts that these treasury notes shall be " lawful money."

3. Nor is this provision valid as being necessary and proper to execute any special power conferred upon congress. Not necessary and proper to enable congress to borrow money on the credit of the United States, as it certainly has no "plain adaptation" or " obvious relation " as a means to that end. It is in no sense a borrowing of money, but on its face a mere attempt to issue money.

Meyer agt. Roosevelt.

It is not " consistent," as a.means to that end, with the provision of the constitution which in substance declares what shall be money, and which was intended to vest in congress the power and the duty of " creating and preserving " a uniform metallic standard of value throughout the country.   It would substantially nullify the whole system of currency established by the constitution.   It is wholly inconsistent with the spirit of the constitutional provisions on that subject.

As applicable to this case to a prior debt, it is entirely unjust, and may well be said "to abridge a pre-existing right."   I regard it as a naked assumption of power, unsupported up to that time by the dictum of any court or judge, or of any commentator upon the constitution, and never before assumed or attempted to be exercised by congress from the beginning of the government.

I am fully aware that in the ultimate decision of this case, interests of magnitude are involved, not for this day merely, but for a distant future.   This, however, is but a preliminary step to its final arbitrament by the supreme court of the United States.

" Courts of law cannot select the subjects for their deliberations."   They can only declare the law upon the questions presented for their adjudication, according to their conscientious convictions.   To do otherwise, would simply destroy the usefulness of a court and dishonor its judges.   I recognize the doctrine to its full extent, that a law should be plainly and clearly unconstitutional, or it should be held valid.   In my judgment, this law, so far as regards the clause in controversy, is clearly and plainly unconstitutional and void.   Nor do I feel called upon in this instance to yield to the authority of this court, on this question, in the seventh district, however great my respect for that learned bench.

Aside from the fact that no two of the learned judges were able to agree upon the ground on which they sev-

erally based the constitutionality of the law, the question is now in course of being reviewed in the court of appeals and will probably be disposed of in that court during the present month so that the community can be kept in suspense but a brief time as to the law, so far as regards the judicial authority of this state ; and, in my judgment, the latitudinarian rules of construction of the constitution of the United States, adopted by this court in the seventh district, as announced by two of the judges, were so novel and so full of peril to the institutions of the country, to its sound and prosperous constitutional government, that I did not feel at liberty to allow them to pass without expressing my dissent from them as well as from the result to which they lead.

Holding; therefore, that these treasury notes are not money, nor a legal tender for private debts, it follows that the mortgage is not paid, and judgment is given for the defendant.